GERALDINE C. MEDINA, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Medina v. Commissioner
Docket Nos. 4083-77, 4084-77, 4085-77, 4086-77, 4087-77, 10591-78, 3208-79, 3209-79, 3210-79, 3211-79.
United States Tax Court
T.C. Memo 1983-253; 1983 Tax Ct. Memo LEXIS 528; 46 T.C.M. (CCH) 76; T.C.M. (RIA) 83253; May 9, 1983. *528 Held, based on all the facts presented, the compensation paid by the petitioner corporations to their president/majority stockholder was reasonable. Held further, the payments made by the petitioner corporation to relatives of its majority stockholder were not purely for services rendered and are adjusted accordingly. Held further, the petitioner corporations' profit sharing plan was qualified under sec. 401, I.R.C. 1954, during the years in question. Michael J. Occhionero, for the petitioners. Frank R. DeSantis, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: In these consolidated cases, respondent determined deficiencies in petitioners' Federal income taxes as follows: [2]
Docket
No.
Petitioner
Year
Deficiency
4083-77
Geraldine C. Medina
1971
$25,855.50
4084-77
Weight Watchers of
Jan. 1, 1972 -
Cleveland, Inc.
Sept. 30, 1972
37,199.68
4085-77
Weight Watchers of
1971
6,418.96
Northeast Ohio, Inc.
Jan. 1, 1972 -
Sept. 30, 1972
5,008.92
4086-77
Weight Watchers of
1971
4,404.24
Lorain, Inc.
Jan. 1, 1972 -
Sept. 30, 1972
896.04
4087-77
Weight Watchers of
1971
2,463.84
Summit, Inc.
Jan. 1, 1972 -
Sept. 30, 1972
4,635.35
10591-78
Geraldine C. Medina
1972
48,248.07
1973
31,515.03
1974
27,031.65
1975
8,941.57
3208-79
Weight Watchers of
Sept. 30, 1973
$18,718.08
Northeast Ohio, Inc.,
Sept. 30, 1974
28,540.26
Geraldine C. Medina,
Transferee
3209-79
Weight Watchers of
Sept. 30, 1973
9,468.84
Lorain, Inc.,
Sept. 30, 1974
14,715.40
Geraldine C. Medina,
Sept. 30, 1975
300.34
Transferee
3210-79
Weight Watchers of
Sept. 30, 1973
31,997.09
Cleveland, Inc.,
Sept. 30, 1974
758.14
Geraldine C. Medina,
Sept. 30, 1975
16,016.77
Transferee
3211-79
Weight Watchers of
Sept. 30, 1973
9,500.80
Summit, Inc.,
Sept. 30, 1974
15,937.82
Geraldine C. Medina,
Sept. 30, 1975
3,639.02
Transferee
*529 After concessions, the issues for decisions are (1) whether the amounts paid to Geraldine C. Medina by petitioners Weight Watchers of Cleveland, Inc., Weight Watchers of Northeast Ohio, Inc., Weight Watchers of Summit, Inc., and Weight Watchers of Lorain, Inc., during the years 1971-1975 constituted reasonable compensation for services rendered within the meaning of section 162(a), I.R.C. 1954; (2) whether payments made by petitioner Weight Watchers of Cleveland, Inc., to Geraldine C. Medina's son, Ramon Triana, in the amount of $1,300 in the taxable year ended September 30, 1973 and to Geraldine C. Medina's sister, Harriet Copperman, in the amounts of $9,000, $9,000, and $1,500 for the respective taxable years ended September 30, 1973, September 30, 1974, and September 30, 1975, were deductible payments for personal services rendered; and (3) whether the profit sharing plan of petitioners Weight Watchers *530 of Cleveland, Inc., Weight Watchers of Northeast Ohio, Inc., Weight Watchers of Summit, Inc., and Weight Watchers of Lorain, Inc., was a qualified plan under section 401(a) for the taxable years in question. Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts, second supplemental stipulation of facts, and exhibits attached thereto are incorporated herein by this reference. Petitioner Geraldine C. Medina is an individual who resided in Cleveland, Ohio at the time of filing her petitions in docket Nos. 4083-77 and 10591-78. She timely filed her Federal income tax returns for each of the taxable years 1971 through 1975 with the Internal Revenue Service Center, Cincinnati, Ohio. Petitioners Weight Watchers of Cleveland, Inc. (docket Nos. 4084-77 and 3210-79), Weight Watchers of Northeast Ohio, Inc. (docket Nos. 4085-77 and 3208-79), Weight Watchers of Lorain, Inc. (docket Nos. 4086-77 and 3209-79), and Weight Watchers of Summit, Inc. (docket Nos. 4087-77 and 3211-79), were each corporations organized under the laws of the State of Ohio with principal office and place of business in Cleveland, Ohio. Each corporate petitioner *531 filed its Federal income tax returns for the taxable years in question with the Internal Revenue Service Center, Cincinnati, Ohio. Issue 1. Reasonable Compensation.
The initial issue is whether amounts paid to Mrs. Medina during the corporate years in issue constituted reasonable compensation for services actually rendered within the meaning of section 162(a)(1). Mrs. Medina formed the petitioner corporations to conduct operations under her franchise from Weight Watchers International, Inc. From the time of their formations in the late 1960's until their dissolutions on September 1, 1975, the petitioner corporations were engaged solely in the business of conducting operations under Mrs. Medina's franchise from Weight Watchers International, Inc. The Weight Watcher concept of weight reduction through a medically approved, nutrition-oriented diet was first introduced in the early 1960's by Jean Nidetch, the founder of Weight Watchers International, Inc. The program employs a classroom-like setting using lecturers, who have themselves successfully completed the Weight Watcher program by achieving their goal weight, to instruct and motivate the dieters on a weekly program basis. *532 The dieters who attend these weekly meetings are first checked in by a clerk who collects the weekly fee and then are weighed in by a weigher. The program stresses the group psychology method and has as its foundation the individual lecturer who must motivate the dieter to first attain his or her goal weight and then to maintain that weight. Prior to becoming involved with Weight Watchers, Mrs. Medina had been actively involved in a number of successful businesses. A native of Cleveland, Mrs. Medina began working for a Cleveland-based family business called Add, Incorporated, in 1941, after 1 year of college at Ohio State. Add, Incorporated, was an Ohio corporation in the business of organizing and managing medical conventions both regionally and throughout the United States. Mrs. Medina's initial position with the company was assistant to her father, who was the president of the corporation; however, upon his death in 1944, Mrs. Medina assumed the position of president. She retained this position until the business was eventually sold in the 1960's. As president of Add, Incorporated, Mrs. Medina was ultimately responsible for all phases of a service-oriented business, which *533 employed hundreds of people during large conventions. Billings of Add, Incorporated, during Mrs. Medina's tenure as president generally averaged about $1 million annually and Mrs. Medina drew a salary in the range of $50,000 to $60,000. In 1954 Mrs. Medina married a Cuban named Alberto Triana and took up residence with him in Cuba; however, she continued to commute to Cleveland to manage the operations of Add, Incorporated. Mrs. Medina remained in Cuba from 1954 until her divorce in 1956 or 1957. While in Cuba she also managed her husband's coffee plantation (which employed 30 people year round and 100-200 people during picking season) and a slag and stone hauling business, both of which she placed on a profitable basis. Mrs. Medina's annual income from her joint business enterprises during this period in the mid-1950's was between $80,000 and $100,000. Upon her divorce from Colonel Triana, Mrs. Medina moved back to the United States for approximately 8 months. She then married Arael Medina, who was also a Cuban, and again took up residence in Cuba for a short period of time just prior to the Cuban revolution. While in Cuba, Mrs. Medina began operating her husband's cattle *534 range, which she also put on a profitable basis. In addition, her husband purchased a citrus grove (which employed approximately 60 people) in the Fort Lauderdale, Florida area, which she managed in conjunction with him. Throughout this period of time, Mrs. Medina was earning in excess of $100,000 a year from her various business endeavors. In 1960 or thereabouts, Mrs. Medina, who was then living in Florida, separated from her husband. Shortly thereafter in 1961, Add, Incorporated, was sold and Mrs. Medina's share of the proceeds amounted to over $200,000. From the time of such sale until 1966, Mrs. Medina was involved in a business enterprise that developed real estate and sold condominium-type housing, referred to as cooperatives. Mrs. Medina's earnings from this enterprise were approximately $75,000 per year. It was in 1966 that Mrs. Medina first became familiar with Weight Watchers while attending Weight Watchers lectures in Florida. During that time she was approached by Jean Nidetch about the prospect of becoming a Weight Watcher franchisee. In order to obtain a Weight Watcher franchise, Mrs. Medina was required to undergo a period of intensive training at the New York *535 offices of Weight Watchers, International, Inc. This training consisted of various classes and lectures on nutrition, diet, and the intricacies of establishing and operating a Weight Watcher franchise. During this training period, Mrs. Medina was not paid by Weight Watchers International, Inc., and was personally responsible for all of her living and educational expenses. Upon completion of her training program, Mrs. Medina purchased a Weight Watcher franchise for a 15-county area in Northeast Ohio. Included in this franchise were the metropolitan areas of Cleveland, Akron, Canton, Youngstown, Lorain, Medina, Huron, Ashland, and Wooster. Mrs. Medina agreed to pay an initial price of $40,000 for the franchise rights. Additionally, she was required to pay 10 percent of her gross receipts derived from the franchise each month to Weight Watchers, International, Inc., in order to retain such franchise rights. Weight Watchers of Cleveland, Inc., was the first of the petitioner corporations formed by Mrs. Medina in September of 1967. Two years later she formed Weight Watchers of Lorain, Inc., Weight Watchers of Northeast Ohio, Inc., and Weight Watchers of Summit, Inc. Mrs. Medina *536 owned all of the issued and outstanding stock of each corporation except for one share of stock of Weight Watchers of Cleveland, Inc., which was owned by her son. She was also president of all four corporations from their inception to their liquidation. Although there were four separate corporations, Mrs. Medina conducted the business as one operation with one central office. Mrs. Medina, through Weight Watchers of Cleveland, Inc., began doing business pursuant to her Weight Watchers franchise in October 1967. Mrs. Medina's activities with Weight Watchers were initially confined to the Cleveland area. She placed ads in neighborhood newspapers to determine the interest in a given area and then invited potential customers to a complimentary open house in order to explain the Weight Watchers program. During the first year of operations, Mrs. Medina was the only lecturer. She generally conducted 12 meetings per week in the mornings and evenings on the east side, west side, south side and uptown areas of Cleveland. During 1967 Mrs. Medina drew no salary from the corporation since there were no funds available for such purpose. Weight Watchers of Cleveland, Inc., had only two employees *537 during 1967. Besides Mrs. Medina, the corporation's only other employee was Mrs. Medina's sister, Harriet Copperman. As was the case with Mrs. Medina, Harriet Copperman was not compensated for her services during her first year of employment with the corporation. Weight Watchers of Cleveland, Inc., had gross sales in 1967 of $4,803, on which it lost $1,153. However, the business grew rapidly as the following table--which reflects the combined gross sales, net earnings, taxes and earnings after taxes for all four Weight Watcher corporations--indicates: Gross
Net earnings
Earnings
Year
sales
(taxable income)
Taxes
after taxes
1967
$4,803
$ (1,153)
$ (1,153)
1968
95,296
23,304 $5,199
18,105 1969 [1]
258,055
32,225 [1]
32,225 1970 [1]
536,597
70,922 [1] 14,905
56,017 1971 [1]
922,712
187,126 [1] 32,299
154,827 1972 [2]
[2] 924,337
[2] 287,772 [2] 124,182
[2] 158,590 1973
954,509
118,652 44,443
74,209 1974
808,936
12,443 11,058
1,385 1975
611,453
(49,058)
1,458
(50,516) Although the figures for 1967 represent only a 3-month period, the growth of Mrs. *538 Medina's Weight Watcher operations from 1967 through the early 1970's was substantial. From 1968--which was the first full year of operations--through the peak year of 1972, gross sales increased almost 13 times, pre-tax earnings rose more than 16 times, and after-tax earnings rose more than 11 times. During such period, the average yearly increase in gross sales was over 96 percent, in pre-tax earnings was almost 107 percent, and in after-tax earnings was over 91 percent. [3] These increases were attributable to the growth Mrs. Medina's franchise enjoyed in the numbers of new members. During the years 1971 through 1975 Mrs. Medina's franchise corporations enrolled anywhere from 16,000 to 25,000 new registrants each year. As business increased and the petitioner corporations started to realize a profit, Mrs. Medina initially chose to plow such earnings back into the business in order to expand her Weight Watchers operations into the outlying areas covered by her Weight Watchers franchise. Such expansion necessitated the hiring of additional employees to serve as lecturers, clerks, weighers, *539 and office personnel. She hired her first two lecturers in 1968, at which time she instituted monthly staff meetings which she conducted the first Sunday of each month.As the business quickly expanded, Mrs. Medina hired additional lecturers, all of whom she personally trained. The role of a lecturer was to conduct the Weight Watcher classes.The lecturer was responsible for the lecture itself and a question-and-answer period at the end of each class. Lecturers were also responsible for screening for, and recommending to supervisors, those individuals who possessed the potential to become Weight Watcher lecturers. During the years 1971 through 1975, the petitioner corporations employed anywhere from 50 to 70 lecturers. In order to train such lecturers, Mrs. Medina conducted and taught numerous 16-week training programs and personally drafted a manual that was used to train the lecturers. She also supervised and reviewed the work of the lecturers, clerks, and weighers, necessitating her attendance at many night classes. Additionally, she conducted special Saturday motivational meetings for overweight employees as well as monthly staff meetings. In carrying on her duties, Mrs. Medina *540 worked long hours, including Saturdays and Sundays. During the years 1971 through 1975, Mrs. Medina generally worked between 50 and 70 hours per week. In addition to training and supervising lecturers and other employees, Mrs. Medina's responsibilities included general business administration for each of the corporations, advertising and promotion, finding and leasing appropriate space for meetings, and franchise committee responsibilities. Among her specific duties, she handled telephone inquiries and technical questions from members and employees, developed and tested new recipes, started and edited the monthly newsletter entitled "Hot Line," wrote a cookbook, supervised the preparation of financial information and tax returns of the corporations, and prepared the monthly reports to Weight Watchers International, Inc. With respect to advertising and promotion, Mrs. Medina directed the entire advertising program of the petitioner corporations including the development and placement of advertisements in local newspapers, radio, and television. She also made personal appearances on radio talk and call-in shows and television programs on behalf of the petitioner corporations. In *541 addition, she made an educational documentary on obesity entitled "Fat, Fat, You're a Water Rat" and cohosted the Jerry Lewis Telethon in the Cleveland area. With respect to her franchise committee responsibilities, Mrs. Medina served as chairman of the franchise New Food Program Committee. In this capacity, Mrs. Medina collaborated with a parallel committee of Weight Watchers International, Inc., and a group of professionals to develop a new diet for Weight Watchers that was used in their francises throughout the world. As found earlier in part, Mrs. Medina did not draw any salary from Weight Watchers International, Inc., or her franchise corporations during either 1966 or 1967. She did begin drawing a comparatively modest salary in 1968, which she increased in 1969 and again in 1970; however, after establishing her salary from Weight Watchers of Cleveland, Inc., at $138,000 in 1970, Mrs. Medina's salary remained constant until the corporation's dissolution in 1975. Mrs. Medina arrived at this figure on the basis of the compensation paid by other Weight Watchers franchises for the various jobs she was performing. [4] *543 In addition, as the other petitioner corporations were formed *542 and commenced operations, Mrs. Medina also drew salaries from those corporations.Those salaries were established by Mrs. Medina commensurate with the amount of time she spent developing and working in such corporations. Once established, these salaries also remained fairly constant with one exception. Mrs. Medina found that she was spending more time than she had anticipated working for Weight Watchers of Summit, Inc., and less time than she had anticipated working for Weight Watchers of Lorain, Inc. Thus, in 1972 she adjusted her salary between the two corporations accordingly. During the years prior to the corporations' dissolutions, Mrs. Medina received the following amounts of nondeferred compensation from the petitioner corporations: Salary Received by
Calendar Years
Geraldine C. Medina:
1967
1968
1969
1970
WW Cleveland, Inc.
$15,000
$50,000
$138,000
WW Northeast Ohio, Inc.
N/A
N/A
N/A
WW Lorain, Inc.
N/A
N/A
N/A
WW Summit, Inc.
N/A
N/A
N/A
Bonus: All corporations combined
Total
0
$15,000
$50,000
$138,000
Salary Received by
Geraldine C. Medina:
1971
1972
1973
1974
1975
WW Cleveland, Inc.
$138,000
$138,000
$138,000
$138,000
$103,500
WW Northeast Ohio, Inc.
30,000
30,000
30,000
30,000
22,500
WW Lorain, Inc.
20,000
10,000
10,560
10,560
7,920
WW Summit, Inc.
10,000
20,100
19,200
19,200
14,400
Bonus: All corporations combined
Total
$198,000
$198,100
$197,760
$197,760
$148,320
As compared to other Weight Watchers franchises with comparable income, Mrs. Medina's executive compensation was somewhat higher than average. According to a report by Mahlon Rubin, C.P.A., of Rubin, Brown, Gornstein & Co., St. Louis, Missouri, [5] who has been employed by the Weight Watchers Franchise Association since 1971, Mrs. Medina's salary when expressed as a percentage of total income was 2.5 percent higher in 1972, 7.6 percent higher in 1973, 12 percent higher in 1974, and 19.4 percent higher in 1975. A comparison of all compensation paid by the petitioner corporations to the comparable franchises reveals that the amounts paid by the petitioner corporations were 9.7 percent less in 1972, 1.3 percent more in 1973, 7.2 percent more in 1974, and 4.9 percent more in 1975. For the 4-year period, the total compensation paid by the petitioner corporations *544 was $11,268 more than was paid by comparable franchises. However, Mrs. Medina personally handled all of the advertising and promotional efforts of her franchise, a factor unique to most Weight Watchers franchises which employed outside advertising agencies. According to Mr. Rubin's report, when all compensation plus advertising and promotional expenses are combined, the petitioner corporations actually paid 11.9 percent less than comparable franchises for such items in 1972, 1.4 percent less in 1973, 4.2 percent more in 1974, and 3.3 percent more in 1975. We find as facts the foregoing statistics of Mr. Rubin. Mrs. Medina did not receive any bonuses from the corporations in addition to her set compensation. She did, however, receive additional amounts from the petitioner corporations in the form of dividends. The petitioner corporations paid the following amounts of dividends from 1971 through 1975: DIVIDENDS PAID TO MRS. GERALDINE C. MEDINA: [1] *545 1971
1972
1973
1974
1975
WW of Cleveland, Inc.
[2] $16,941.31
$20,700.00
$100.00
WW of Northeast Ohio,
Inc.
10.00
10.00
12,794.00
500.00
WW of Lorain, Inc.
10.00
10.00
10,400.00
100.00
WW of Summit, Inc.
10.00
10.00
200.00
Total
$16,971.31
$30.00
$44.094.00
$0
$700.00
In his notices of deficiency sent to the joint petitioners, respondent determined that the following amounts constituted reasonable nondeferred compensation for Mrs. Medina's services: 1/1/72-
1971
9/30/72
9/30/73
9/30/74
9/30/75
WW Cleveland, Inc.
Claimed
$103,500
$138,000
$138,000
$138,000
Allowed
66,742
87,870
71,312
69,550
WW Northeast
Ohio, Inc.
Claimed
$30,000
22,500
30,000
30,000
Allowed
21,667
15,460
19,102
15,503
WW Lorain, Inc.
Claimed
20,000
10,560
10,560
10,560
Allowed
14,444
6,724
5,457
5,322
WW Summit, Inc.
Claimed
10,000
15,300
19,200
19,200
19,200
Allowed
7,222
7,938
12,225
9,922
9,677 Duplicate notices were sent to the dissolved corporations and to Mrs. Medina, as transferee of the dissolved corporations' assets. [6] *546 In a separate notice of deficiency sent to Mrs. Medina, respondent determined--for 1972, 1973, 1974, and 1975--that the excess amounts of nondeferred compensation did not qualify for personal service income under section 1348, relating to the maximum tax on such income. Section 162(a)(1) provides that there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered. The regulations provide that "[t]he test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services." Sec. 1.162-7(a), Income Tax Regs.Electric & Neon, Inc. v. Commissioner,56 T.C. 1324, 1340 (1971), affd. without opinion 496 F.2d 876 (5th Cir. 1974). The question of whether amounts paid represent reasonable compensation for services is one of fact to be determined from all the facts and circumstances of the case. Charles Schneider & Co. v. Commissioner,500 F.2d 148, 151 (8th Cir. 1974), affg. a Memorandum Opinion of this Court, cert. denied 420 U.S. 908 (1975); Home Interiors & Gifts, Inc. v. Commissioner,73 T.C. 1142, 1155 (1980). *547 The determination of the Commissioner is presumptively correct, and the burden of proving the reasonableness of the compensation is upon petitioners. Botany Worsted Mills v. United States,278 U.S. 282 (1929). When the case involves a closely held corporation where the controlling shareholders-executives set their own compensation as executives, close scrutiny is required to determine whether the alleged compensation is, in fact, a distribution of profits. Charles Schneider & Co. v. Commissioner, 500 F. 2d at 152; Levenson & Klein, Inc. v. Commissioner,67 T.C. 694, 711 (1977). The factors considered relevant in determining reasonableness of compensation include-- the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount *548 of compensation paid to the particular employee in previous years. * * * [Mayson Mfg. Co. v. Commissioner,178 F.2d 115, 119 (6th Cir. 1949), revg. a Memorandum Opinion of this Court.] In making such a determination, no single factor is decisive; rather, we must consider and weigh the totality of facts and circumstances in arriving at our decision. Mayson Mfg. Co. v. Commissioner,supra.
Respondent contends that the compensation paid to Mrs. Medina was unreasonable in amount for the services she rendered to the petitioner corporations and that such compensation was only a means of distributing the profits of the corporations. In determining the amount of reasonable compensation allowable as a deduction by the petitioner corporations, respondent utilized two different approaches. In 1971 and 1972 the examining agent put Mrs. Medina on a time clock using an hourly rate of $44.80 times 40 hours a week. However, for the years 1973 through 1975 the examining agent used a percentage of sales approach in arriving at the amounts allowed as deductions for reasonable compensation. Respondent has failed to explain why two different approaches were utilized in determining a reasonable allowance *549 for Mrs. Medina's salary. With respect to 1971 and 1972, respondent has offered no explanation as to why only 40 hours per week were used in computing a reasonable allowance for such years when Mrs. Medina generally worked anywhere from 50 to 70 hours per week during those years. Furthermore, in establishing the amounts allowed as reasonable by respondent in the years 1973 through 1975, no consideration was given to Mrs. Medina's qualifications and business experience, the corporations' dividend paying history, or the percentage of salary Mrs. Medina received to the taxable earnings of the corporations after such salary. Respondent argues that Mrs. Medina's Weight Watchers business was, for the most part, self operating and that the success of her franchise operations was more the product of the efforts of Weight Watchers International, Inc., than her personal contributions. However, respondent failed to present any expert testimony to support his position. After careful review of the entire record, we are convinced the amounts pai to Mrs. Medina for each of the corporate years in issue constituted reasonable compensation for services actually rendered within the ambit of section 162(a)(1). *550 Our conclusion is based on those Mayson factors that we deem relevant to the facts and circumstances at hand. When Mrs. Medina first became involved with Weight Watchers in 1966, she brought with her 25 years of solid business experience. She had previously occupied positions of leadership and responsibility in several different business ventures and had compiled a highly successful track record. She was also well compensated for her efforts. During the 1950's she was earning in excess of $100,000 a year from her various business interests, a sum that, when inflation is factored in, probably exceeds the amount of compensation she was deriving from the petitioner corporations during the tax years in issue. While it is true that her background was not specifically in the area of weight reduction, we believe that the invaluable experience she gained in managing and marketing served her well in running a service-oriented business such as Weight Watchers. Thus, we believe Mrs. Medina's qualifications and experience are factors which strongly support the reasonableness of the compensation she received during the years in question. With respect to the nature, extent, and scope of Mrs. *551 Medina's work, the evidence indicates that the services performed by Mrs. Medina were extensive and that she was responsible to a large extent for the financial success and growth of her Weight Watchers franchise. As the chief executive officer of each of the petitioner corporations, Mrs. Medina worked long hours and had a hand in almost every aspect of the corporations' business. Moreover, Mrs. Medina was responsible for a number of innovations such as a training manual for employees; the Hot Line, which was a newsletter she established; a cookbook of Weight Watchers recipes; and a documentary film on obesity entitled "Fat, Fat, You're a Water Rat." Additionally, Mrs. Medina was active with Weight Watchers on a national level as evidenced by her chairing of the franchisee New Food Program Committee. The fact that Mrs. Medina eventually sold the franchise, which she initially purchased in 1967 at a price of only $40,000, for a sum in excess of $1.5 million certainly indicates that she "must have been doing something right." This is further evidenced by the fact that Weight Watchers International, Inc., thought enough of her abilities to contract for her services as a part-time consultant *552 at a salary of $5,000 per month, for which she has promised to perform not more than 9 days per month in actual consultation.
The third factor present in the Mayson case pertains to the size and complexities of the business being operated by the officer whose salary is in dispute. In operating a personal service business in a 15-county area, Mrs. Medina was responsible for as many as 175 meetings per week in almost as many different locations. The mere number of meetings, along with the multiplicity of locations, illustrates the complexities involved in operating her franchise. During the tax years in question, Mrs. Medina's franchise obtained anywhere from 16,000 to 25,000 members annually. Overseeing the servicing of such a large number of customers and adequately reporting her franchise's activities to Weight Watchers International, Inc., obviously placed a great deal of responsibility on Mrs. Medina's shoulders, for which she deserved to be well compensated. Another factor enumerated in Mayson is a comparison of salaries paid with gross income and net income. We have previously held that where, for 6 consecutive years, the disputed salary of a taxpayer equaled anywhere from *553 99.7 to 99.9 percent of the corporation's income before compensation, while the corporation was paying no dividends, that such percentages were virtually conclusive of the fact that the salary formula was drafted to drain off the corporation's income as compensation. [7] Such is not the case here. A similar comparison in the instant case reveals that, although Mrs. Medina's salary was substantial and in 1 year even exhausted the corporations' income, Mrs. Medina's salary was clearly not set to drain off the petitioner corporations' income so as to avoid either the imputation of tax at the corporate level or a payment of dividends. The following chart displays Mrs. Medina's salary as a percentage of income before such compensation: 1/1/72-
1971
9/30/72
9/30/73
9/30/74
9/30/75
Gross receipts
$922,713
$924,327
$954,509
$808,936
$611,453
Income before compensation
385,126
436,432
316,412
210,203
148,704
Medina's current
198,000
148,660
197,760
197,760
197,760
compensation
Percentage of compensation
to income
51.4% 34.0% 62.5% 94.0% 132.9% As the chart illustrates, Mrs. Medina's salary remained constant throughout the period so that she did not drain off the petitioner *554 corporations' income as compensation when sales were high. To the contrary, the petitioner corporations paid over $213,000 in taxes during the relevant period, including over $124,000 for the 9-month tax year in 1972. Another factor which tends to substantiate the reasonableness of Mrs. Medina's salary is that the petitioner corporations paid some dividends to Mrs. Medina during the tax years in question. In point of fact, in the years 1971 and 1973, Mrs. Medina received in excess of $61,000 in taxable dividends from the petitioner corporations. Thus, considering the fact that her initial investment in the Weight Watchers franchise was only $40,000, Mrs. Medina received a return on her initial investment in excess of 150 percent during the years in issue. One factor in Mayson which initially appears to weigh adversely on Mrs. Medina's case is the prevailing rates of compensation in comparable concerns. According to the report offered by Mr. Rubin, Mrs. Medina's compensation was indeed higher than that which was paid to the executives of several comparable franchises. However, several factors mitigate the utility of such figures. First, Mr. Rubin testified that the predominant *555 number of original franchisees lacked any prior business background. In contrast, Mrs. Medina brought to Weight Watchers her 25 years of business experience. Such experience enabled Mrs. Medina to operate a franchise for a 15-county area from one central office without any middle management intervention. Based on the fact that the total compensation paid by Mrs. Medina's franchise was roughly equivalent to that paid by the comparable franchises, it appears that Mrs. Medina was performing duties for her franchise which other, less experienced franchisees were hiring employees to perform. Furthermore, Mr. Rubin's report clearly supports Mrs. Medina's assertion that she personally handled all advertising and promotion for her Weight Watchers franchise, while other franchises hired outside advertising agencies to perform such functions. Mrs. Medina's performance of such duties obviously mandated a higher level of compensation for her than for the executives of such franchises which contracted out such responsibilities. After all, section 162(a)(1) was not designed to regulate businesses by denying them a deduction for the payment of compensation in excess of the norm. Home Interiors & Gifts, Inc. v. Commissioner,supra at 1162. *556 While the payment of abnormally high compensation does warrant careful scrutiny to insure that the payments were made for services actually rendered, we are convinced that Mrs. Medina earned her compensation. Another important factor which was discussed in Mayson is the compensation paid to the employee whose salary is in question during previous years. In the present case, Mrs. Medina's salary rose dramatically during her franchise's first 4 years of operation from none in 1967 to $15,000 in 1968, to $50,000 in 1969, to $138,000 in 1970, and finally to $198,000 in 1971. Respondent argues that such a significiant increase in compensation, without an accompanying change in duties or responsibilities, indicates that a portion of the compensation paid to Mrs. Medina was unreasonable. We do not agree that that is the situation here. Mrs. Medina was earning in excess of $100,000 per year during the 1950's from her various business ventures prior to becoming involved with Weight Watchers. Based on her prior business experience, it is obvious that Mrs. Medina, rather than being overcompensated during the years in question, was instead undercompensated during the franchise's early years. *557 This conclusion is supported by Mrs. Medina's testimony that she decided to plow the earnings of the petitioner corporations into expansion rather than withdraw any in the form of salary during the years prior to the years in question. Furthermore, once established Mrs. Medina's salary remained constant during the existence of the petitioner corporations. We have previously held the receipt of a token salary in prior years by an officer/shareholder did not mean that such officer must forever receive a token amount, even if his duties had increased little in the year that a more substantial salary was granted. Austin State Bank v. Commissioner,57 T.C. 180, 188 (1971). Similarly, we do not believe that the fact that Mrs. Medina was undercompensated during prior years should forever doom her to be undercompensated barring a significant change in duties or responsibilities. [8] *558 In summary, after a careful analysis of all of the facts and circumstances along with a careful weighing of those circumstances, we conclude and hold that the compensation paid to Mrs. Medina in the years 1971 through 1975 was reasonable within the meaning of section 162(a)(1). Issue 2. Payments Made to Relatives.
The second issue is the deductibility of payments made by petitioner Weight Watchers of Cleveland, Inc., to Geraldine C. Medina's sister, Harriet Copperman, and to Mrs. Medina's son, Ramon Triana. Harriet Copperman, who was instrumental in first *559 getting Mrs. Medina interested in Weight Watchers, commenced working for the petitioner corporation on a full-time basis in 1967. During approximately the first year and a half of such employment, Harriet Copperman worked without compensation. In 1971 she served as the corporation's treasurer and received a salary of $26,000; however, in 1972 she contracted cancer and was forced to terminate her employment. The corporate minutes for Weight Watchers of Cleveland, Inc., dated September 27, 1972 state as follows: That Harriet Copperman be, and is hereby removed as Secretary-Treasurer of the Corporation effect this date. In consideration for her prior employment without pay, and since the petitioner corporation did not have any disability or health insurance for its employees, petitioner Weight Watchers of Cleveland, Inc., paid and deducted payments to Harriet Copperman for the taxable years ended September 30, 1973, September 30, 1974 and September 30, 1975, in the respective amounts of $9,000, $9,000, and $1,500. Petitioners argue that such payments constituted severance pay and were set at one-third of her then salary for a 2-year period. There was no corporate resolution awarding *560 such severance pay and no other employee of the petitioner corporations ever received severance pay. During the taxable year ended June 30, 1973, petitioner Weight Watchers of Cleveland, Inc., also issued checks in the amount of $1,300 to Ramon Triana while he was away at college and deducted such amounts as salary expense. Petitioners argue that these payments were for services performed by Ramon Triana for the corporation while he was home from school for "long weekends." In his notice of deficiency dated December 15, 1978, respondent disallowed the claimed deductions for salary to Harriet Copperman and Ramon Triana on the grounds that the amounts deducted did not constitute ordinary and necessary business expenses within the meaning of section 162. Additionally, in his notice of deficiency dated June 16, 1978, respondent increased Mrs. Medina's income by the amount of such payments as constructive dividends. Section 162(a) includes, among the "ordinary and necessary" expenses deductible by a business, a "reasonable allowance for salaries or other compensation for personal services actually rendered." When, however, a corporation makes payments to an individual who is not performing *561 services for the corporation, there must be shown a business benefit derived by the corporation for such payments to be deductible. If no services are rendered, a purported salary may be treated as a constructive distribution under section 301 to the stockholder who received it or whose relative or donee received it.
In the instant case, Harriet Copperman was hospitalized during 1973 and never returned thereafter to the offices of the petitioner corporation. Nevertheless, she received a salary from Weight Watchers of Cleveland, Inc., for some time thereafter allegedly constituting severance pay in consideration for her prior employment without pay. It is an acceptable principle that an employer may pay an employee compensation in recognition of past undercompensated services, and that such payments are currently deductible by the employer if reasonable in amount. Lucas v. Ox Fibre Brush Co.,281 U.S. 115 (1930). However, we have previously held that the fact of undercompensation alone is not enough to support a deduction. The amount by which the employee in question was undercompensated must also be shown for any deduction to be allowed. American Foundry v. Commissioner,59 T.C. 231, 239 (1972), *562 affd. on this issue 536 F.2d 289 (9th Cir. 1976). The record before us is far from clear as to the amount by which Harriet Copperman may have been undercompensated. Although we believe that she did indeed work without compensation during a period of time there is insufficient evidence as to the nature and extent of her duties during that time, or as to the hours she actually worked. Nevertheless, we believe that Harriet Copperman is justifiably entitled to some amount of compensation for the period she served without pay. Thus, realizing there are no exact standards, we, based on the existing record, find $5,000 of the amounts paid to Harriet Copperman for the year ended September 30, 1973 to be compensation for services deductible under section 162. With regard to the remaining $14,500, respondent's determination is sustained. With respect to the payments made to Ramon Triana, we have no difficulty in upholding respondent's determination. Although Mrs. Medina testified that the payments were made for services actually rendered, petitioners failed to introduce any evidence as to specifically when such services were actually performed or as to the hours Mr. Triana actually worked. *563 Petitioners have simply failed to carry their burden of proof with respect to this issue and thus respondent's determination must be sustained. Issue 3. Qualification of Profit Sharing Plan.
The final issue for our consideration is whether the petitioner corporations' profit sharing plan was a qualified plan under section 401(a). On December 1, 1969, petitioner Weight Watchers of Cleveland, Inc., by corporate resolution established the Weight Watchers of Cleveland, Inc., Profit-Sharing Plan and Trust for its employees. This plan provided for contributions on behalf of qualified employees from available corporate profits up to a maximum of 15 percent of such qualified employees' salaries. Following adoption of the plan, the petitioner corporation sent a copy of the plan to the Profit Sharing and Pension Trust Division of the Internal Revenue Service, along with an application for ruling under section 401(a).The petitioner corporation subsequently received a favorable determination letter from respondent on March 12, 1970. The profit sharing plan and trust instituted by Weight Watchers of Cleveland, Inc., was thereafter adopted on December 16, 1971, by petitioners Weight Watchers *564 of Northeast Ohio, Inc., Weight Watchers of Lorain, Inc., and Weight Watchers of Summit, Inc. On September 22, 1972, the petitioner corporations submitted to the Profit Sharing and Pension Trust Division of the Internal Revenue Service a Form 4573 (Application for Determination) in regard to an amendment to the profit sharing plan that, among other things, added the remaining corporations to the plan. Respondent subsequently issued a favorable determination letter with respect to the amended profit sharing plan on November 2, 1972. The National City Bank of Cleveland was designated as trustee of the trust created pursuant to the Weight Watchers of Cleveland, Inc., Profit-Sharing Plan and Trust; and, throughout the tax years in question, the petitioner corporations made contributions to the trust on behalf of the qualified employees. The following tables reflect the profit sharing contributions made by the petitioner corporations during the years 1971 through 1974: PROFIT SHARING PLAN CONTRIBUTIONS
1971
Salary
Contribution
Sue Arnold
$3,961.59
$ 594.24
M. Clark
9,250.00
1,387.50
Harriet Copperman
26,000.00
3,900.00
Geraldine Medina
198,000.00
29,700.00
Ilona Messinger
5,700.13
855.02
M. Roenbaugh
22,400.00
3,360.00
Janet York
5,664.13
849.62
$40,646.38
PROFIT SHARING PLAN CONTRIBUTIONS
September 30, 1972
Salary
Contribution
Geraldine Medina
$148,660.00
$22,299.00
Janet York
5,749.00
862.35
Ilona Messinger
4,646.70
697.00
Sue Arnold
3,313.31
497.00
Frances LoPresti
5,448.25
817.24
Harriet Copperman
10,500.00
1,575.00
$26,747.59
PROFIT SHARING PLAN CONTRIBUTIONS
September 30, 1973
Salary
Contribution
Geraldine Medina
$197,760.00
$29,664.00
Janet York
6,330.00
949.50
Suzanne Arnold
4,149.51
622.43
Frances LoPresti
8,260.00
1,239.00
Harriet Copperman
9,000.00
1,350.00
$33,824.93
*565 PROFIT SHARING PLAN CONTRIBUTIONS
September 30, 1974
Salary
Contribution
Geraldine Medina
$197,760.00
$29,664.00
Janet York
4,752.00
712.80
Dorothy Kurtz
4,878.50
731.78
Frances LoPresti
8,365.00
1,254.75
Harriet Copperman
9,000.00
1,350.00
TOTAL
$224,755.50
The petitioner corporations deducted these contributions to the Weight Watchers of Cleveland, Inc., Profit-Sharing Plan and Trust as a business expense during the tax years at issue. In his notices of deficiency to the petitioner corporations, respondent disallowed such deductions on the grounds that the petitioner corporations' profit sharing plan was not qualified under section 401. A profit sharing plan is an arrangement under which the employees of a business can share in the profits of their employer's trade or business. Sec. 1.401-1(a)(2)(ii), Income Tax Regs.Section 404(a)(3) authorizes a deduction by an employer of amounts contributed to a profit sharing trust provided the trust is a qualified trust as defined by section 401(a). Section 401(a) and the regulations promulgated thereunder detail extremely complex requirements for meeting the status of a qualified profit sharing plan. Only a plan which meets each and every requirement enumerated *566 in section 401(a) is eligible for the favorable tax treatment accorded to qualified plans. In the instant case, respondent's notice of deficiency to Weight Watchers of Cleveland, Inc., on February 2, 1977 stated: (b) It is determined that you did not have a profit-sharing plan qualified under section 401 of the Internal Revenue Code during the taxable year January 1, 1972 through September 30, 1972 therefore, your contributions of $19,190.59 in the taxable year January 1, 1972 through September 30, 1972 are not deductible under section 404 of the Internal Revenue Code. Accordingly, your taxable income is increased by $19,190.59. Each of the notices of deficiency mailed to the petitioner corporations contained similar language. Considering the intricacies of the requirements for qualification of a profit sharing plan, we do not look with favor on respondent's simply stating in his statutory notice of deficiency that a plan is disqualified without stating specific reasoning therefor. In the instant case, respondent advised the petitioner prior to issuing the notice of deficiency that the reason for the disqualification was the refusal of Mrs. Medina to sign an agreement that provided *567 as follows: The undersigned principals to hereby agree that if the salary (non-deferred compensation) paid to Geraldine C. Medina is ultimately determined to be any amount less than the amount deducted on the Federal Income Tax returns of Weigh Watchers of Cleveland, Inc. for the taxable years ended December 31, 1971, and September 30, 1972, the resulting excess funds contributed on her behalf and allocated to her account under the Weight Watchers of Cleveland, Inc. Profit Sharing Plan will be subtracted from her account balance and reallocated proportionately to the accounts of all plan participants on the basis of compensation. The term "ultimately determined" means a final determination by the Conference Staff, the Appellate Division or in any court action which the undersigned principals may wish to pursue. Because of Mrs. Medina's refusal to sign this agreement, the Internal Revenue Service agent conducting the audit determined that the plan had become discriminatory in operation since contributions in relation to Mrs. Medina, because of her alleged unreasonable compensation, were relatively greater than for rank-and-file employees. However, at the trial itself, respondent *568 abandoned this prior stated ground and, instead, advanced two others, namely: (1) The petitioner corporations' profit sharing plan was not communicated to their employees. (2) The profit sharing plan of the petitioner corporations discriminated in its administration and operation with respect to contributions and benefits in favor of the officers, the sole shareholder, and a highly compensated employee. Naturally, petitioners claimed surprise and prejudice. While we would have preferred that petitioners specify how they could have rebutted the newly raised grounds and consequently specifically what proof theywould have presented had they been aware of respondent's new position, we can well understand their claim of prejudice and believe that it has merit. Consequently, we place the burden of proof on this issue on respondent. Rule 142(a), Tax Court Rules of Practice and Procedure. In reaching this conclusion, we note respondent's reliance on our holding in Big "D" Development Corp. v. Commissioner,T.C. Memo. 1971-148, affd. per curiam 453 F.2d 1365 (5th Cir.), cert. denied 405 U.S. 945 (1972), and find it misplaced. In that case, the Commissioner merely narrowed the issue in *569 his opening brief after taking a broad position in his statutory notice. In the instant case, however, the petitioner corporations were notified that the reason for the disqualification of their profit sharing plan was the refusal of Mrs. Medina to sign an agreement to reallocate any contributions on her behalf attributable to excess compensation. Although the statutory notices in the present case were broadly written, the petitioner corporations had every reason to expect respondent to rely on the grounds previously communicated to them for the profit sharing plan's disqualification. Thus, we believe that the abandonment of such grounds and the adoption at trial of two previously unstated grounds for the profit sharing plan's disqualification constituted a sufficient surprise to the petitioner corporations to mandate allocating the burden of proof on this issue on respondent. The minimal evidence presented by respondent on this point is insufficient to carry his burden of establishing a prima facie case and it follows that we hold for petitioners and find petitioners' profit sharing plan to be a qualified plan. Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Weight Watchers of Cleveland, Inc., docket No. 4084-77; Weight Watchers of Northeast Ohio, Inc., docket No. 4085-77; Weight Watchers of Lorain, Inc., docket No. 4086-77; Weight Watchers of Summit, Inc., docket No. 4087-77; Geraldine C. Medina, docket No. 10591-78; Weight Watchers of Northeast Ohio, Inc., Geraldine C. Medina, Transferee, docket No. 3208-79; Weight Watchers of Lorain, Inc., Geraldine C. Medina, Transferee, docket No. 3209-79; Weight Watchers of Cleveland, Inc., Geraldine C. Medina, Transferee, docket No. 3210-79; and Weight Watchers of Summit, Inc., Geraldine C. Medina, Transferee, docket No. 3211-79.↩
2. The notices of deficiency were mailed on Feb. 2, 1977 in docket Nos. 4083-77, 4084-77, 4085-77, 4086-77 and 4087-77 and on June 16, 1978 in docket No. 10591-78. The notices of transferee liability were mailed on Dec. 15, 1978 in docket Nos. 3208-79, 3209-79, 3210-79 and 3211-79.↩
1. In fiscal years 1969-1971, one corporation, Weight Watchers of Cleveland, Inc., was a subchapter S corporation. ↩
2. Nine-month year only due to change in fiscal year to year-to-yearend of Sept. 30.↩
3. The comparative figures are based on annualizing the 9-month figures given on the chart for 1972.↩
4. This information was obtained from the Weight Watcher Franchise Association.
5. Mr. Rubin's report has been stipulated into evidence by petitioners and respondent. Mr. Rubin's figures are based on comparisons with six other franchises in 1972, eight other franchises in 1973, seven other franchises in 1974, and six other franchises in 1975.↩
1. Amounts as shown on corporate returns, amounts differ on Medina individual returns. 2. This corporation was subchapter S in 1971. Dividend results from accumulated earnings and profits carried over from years prior to subchapter S election.↩
6. Mrs. Medina sold her franchise in 1981 for a price in excess of $1,500,000. Additionally, she signed a consulting contract with Weight Watchers from which she receives $5,000 a month for no more than 9 days of work each month.
7. Cromer v. Commissioner,T.C. Memo. 1980-263↩.
8. Along these lines, one final consideration that we believe merits mention is the fact that for 2 full years Mrs. Medina worked without pay in obtaining and setting up her franchise. Mrs. Medina testified that this was one of the factors which she took into consideration when she finally fixed her salary from the petitioner corporations. It is well settled that compensation paid in the current year for past services may be deducted even though that amount, when added to compensation for the employee's current service, exceeds a reasonable allowance for current services. Lucas v. Ox Fibre Brush Co.,281 U.S. 115 (1930). Thus, even if Mrs. Medina's compensation had been excessive for her current services during the years in question, it would not have been unreasonable in light of her past services since there is no requirement under sec. 162 that the services be rendered during the taxable year. Lucas v. Ox Fibre Brush Co.,supra.↩